UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| G&T CONVEYOR CO. INC, <br><br> Plaintiff, <br><br> v. <br><br> PORT OF SEATTLE, <br><br> Defendant. | CASE NO. C07-1380RSM <br><br> ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, GRANTING IN PART DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT, AND DIRECTING PARTIES TO PROCEED WITH THE DISPUTE RESOLUTION PROCESS |

## I.  INTRODUCTION

This matter comes before the Court on "Plaintiff G&T Conveyor Company, Inc.'s Motion for Partial Summary Judgment" (Dkt. #7), and Defendant "Port of Seattle's Cross Motion for Summary Judgment" (Dkt. #14). Plaintiff G&T Conveyor Company, Inc. ("G&T") argues that Defendant Port of Seattle ("the Port") must immediately pay G&T certain amounts pursuant to the terms of the contract entered into by the parties. G&T also argues that the Port has waived their right to participate in the dispute resolution process pursuant to the contract, thereby making the instant claim ripe for review in this Court.

The Port responds that G&T's arguments are based on a faulty interpretation of the contract, and that no immediate payments are due at this time. The Port further argues that it has not waived its right to follow the dispute resolution process of the contract. Thus, the Port argues that G&T has no right to maintain an action before the Court and seeks dismissal

MEMORANDUM ORDER
PAGE - 1

of G&T's claims. Alternatively, the Port argues that the Court should enter a declaratory judgment requiring the parties to proceed with the dispute resolution process.

For the reasons set forth below, the Court DENIES "Plaintiff G&T Conveyor Company, Inc.'s Motion for Partial Summary Judgment" and GRANTS IN PART Defendant "Port of Seattle's Cross Motion for Summary Judgment"

## II. DISCUSSION

### A. Background

G&T is a Florida corporation engaged in the business of the design, construction, and installation of sophisticated, complex, integrated security screening baggage handling systems at airports across the United States. (Dkt. #1, Pl.'s Compl., ¶¶ 1.1, 3.1). The Port is a municipal corporation that owns and operates the Seattle-Tacoma International Airport ("Sea-Tac"). (*Id.* at ¶ 1.2). On May 14, 2004, G&T successfully bid on a fixed-price contract for the construction and installation of a baggage handling system at Sea-Tac in the amount of $25.3 million. (Dkt. #14 at 2). The project, which was part of a multi-billion dollar capital improvement program at Sea-Tac, is known as the C60 Baggage Handling System Project (the "C60 project"). (*Id.*).

Pursuant to the terms of the contract for the C60 project, general written conditions were agreed upon by the parties. The portions of the contract that the parties allege are pertinent to this litigation include:[1]

| | |
|---|---|
| G-01.02 | Definitions |
| G-02.01 | Intent of the Contract Documents |
| G-02.02 | Correlation of the Contract Documents |
| G-04.31 | Notice of Claims |
| G-04.32 | Prerequisite to Suit |
| G-07.02 | Progress and Completion |
| G-07.03 | Extension of Contract Time |
| G-08.01 | All Payments Subject to Applicable Laws |
| G-08.02 | Scope of Payment |
| G-08.04 | Progress Payments |
| G-08.06 | Payment for Work Done on a Force Account Basis |
| G-08.07 | Payment for Changes |

---

[1] The Court will discuss the applicable provisions, where appropriate, in its "Discussion" session below.

MEMORANDUM ORDER
PAGE - 2

|  |  |
|---|---|
| G-09.01 | Port May Make Changes |
| G-09.04 | NTE and Unilateral Change Orders |
| G-09.05 | Changed Conditions and Claims including REAs |
| G-09.06 | Procedure for Protest by the Contractor |
| G-10.02 | No Waiver of Port's Rights |
| G-10.10 | Port's Right to Withhold Payment |

(Dkt. #14, Ex. 1).[2]

In addition to these general conditions, the contract for the C60 project also included supplementary conditions. (*Id.*, Ex. 2). Both parties agree that the pertinent supplementary condition ("SC") in the instant case is SC-09.06, titled "Procedure for Protest by the Contractor." (*Id.*). In sum, this provision requires the parties to submit to a Dispute Review Board ("DRB") if a disputed claim is not resolved after a certain meeting takes place, and to nominate a member to the DRB within 60 days of the date of the award. (*Id.*).

As alleged by the Port, G&T began work on the C60 Project soon after May 14, 2004, and was supposed to have achieved substantial compliance by March 31, 2006. (*Id.*). The Port alleges that the date of substantial completion was extended to September 4, 2006, but that G&T has not yet achieved that milestone. (*Id.* at 3). However, G&T alleges that it has completed the base contract work. (Dkt. #7 at 2). Furthermore, during the course of the C60 project, a significant number of change orders were issued by the Port.[3] G&T alleges that in addition to completing the base contract work, it has also completed the work related to the change orders to the C60 project. (*Id.*).

Based on its completion of the change orders, G&T delivered a "Request for Equitable Adjustment" ("REA") on May 10, 2007. (Dkt. #8, Ex. 3). In the REA, G&T requested approximately $16.6 million in addition to the fixed contract amount. (*Id.*). On May 16, 2007, the respective parties met to discuss G&T's REA. (*Id.*, Ex 4). During the meeting, G&T alleges that the Port acknowledged that "G&T is owed more money than the current

---

[2] Both parties at different times call the relevant provisions "sections." The Court will adhere to the provisions as "articles," the title given to them by the contract itself.

[3] G&T alleges that 163 change orders were issued by the Port (Dkt. #1, ¶ 3.5), whereas the Port alleges that 165 change orders were issued by the Port. (Dkt. #17 at 13).

MEMORANDUM ORDER
PAGE - 3

1  C60 contract value," and that "G&T is owed more money than it has been paid for the change

2  orders issued." (*Id.*). Nevertheless, the Port, through the declaration of Michael Mequet

3  ("Mr. Mequet") - who was in charge of and responsible for all major capital construction

4  projects undertaken by the Port - alleges that although they acknowledged that "G&T was

5  probably due additional money under its Contract . . . *all change issues*, both those in favor of

6  G&T and those in favor of the Port, would have to be analyzed to make a *final determination*

7  *as to monies owed*." (Dkt. #14, Decl. of Mequet, ¶ 8) (emphasis added).

8  Two subsequent meetings occurred on May 24, 2007, and May 30, 2007. (Dkt. #14

9  at 9). The Port alleges that several questions were raised by the Port regarding the REA at

10 these meetings. (*Id.* at 9-10). The Port alleges that Mr. Mequet indicated to G&T at these

11 meetings that it was not possible for the Port to make a realistic assessment of any element of

12 the REA at that time. (*Id.*). In addition, Mr. Mequet allegedly pointed out to G&T that

13 because G&T had taken many months to put the REA together, it was only fair that the Port

14 be given adequate time to analyze the documentation. (*Id.*).

15 Shortly thereafter, on June 1, 2007, G&T submitted another bill to the Port indicating

16 that the total amount of the services rendered by G&T exceeded $52.9 million. (Dkt. #7, Ex.

17 5). The bill also indicates the Port had paid approximately $34.7 million to G&T, thereby

18 creating a then current balance of approximately $18.2 million. (*Id.*). The Port has not,

19 however, paid this amount to G&T because it claims it is "engag[ing] in a diligent, rigorous

20 and extensive effort to review, analyze and evaluate the documentation provided by G&T in

21 support of its REA." (Dkt. #14 at 10). The Port indicates that the following events show that

22 it has been reviewing G&T's REA in accordance with standard procedures:

23 - On May 10, 2007, G&T submitted the initial REA seeking $16.6 million
24 (including $1.7 M for its electrical subcontractor Elcon). The REA included 4
    notebooks with 95 exhibits.

25 - On May 30, 2007, the Port posed 38 questions to G&T.

26 - On June 4, 2007, G&T answered the Port's questions of May 30 with a thick
    notebook of exhibits A-N; this response increased the Elcon Claim from $1.7
27  million to $2.2 million.

28 - On June 6, 2007, the Port responded to G&T's letters of May 28, 2007 and

MEMORANDUM ORDER
PAGE - 4

> May 31, 2007 by reiterating that the Port was proceeding to evaluate the REA under articles G-04.31 and G09.05 of the contract.
>
> - On June 21, 2007, the Port notified G&T that the schedule analysis contained in its REA did not meet the contract requirements of specification section 01323. The Port requested a Time Impact Analysis as required and asked for a date on which it would be provided. G&T did not respond to the Port's requests.
>
> - On August 30, 2007, the Port, prompted by G&T's submission of June 4, 2007, forwarded 52 questions and requests for clarification on all aspects of the REA.
>
> - On September 5, 2007, the Port explained to G&T its process of evaluation.
>
> - On September 28, 2007, G&T responded to the Port's questions and requests of August 30, 2007 with 55 pages of narrative and a notebook with 31 exhibits. In this submission, G&T reviewed various components of its REA. Although not directly stated by G&T, it appears to the Port that the amount of the REA increased to $21.2 million (including the Elcon claim).
>
> - On October 19, 2007, the Port requested additional information.
>
> - On November 26, 2007, G&T responded to the Port's request of October 19, 2007 with answers to the Port's questions. It also revised the REA by deleting the Elcon Claim but substantially increasing the amount being claimed by G&T to $18.3 million.
>
> - On November 28, 2007, two days later, G&T delivered 10 notebooks of additional documentation, most of which dealt with its subcontractors.

(*Id.* at 11-12).[4]

It is important to note that the Elcon claim mentioned above plays an important part in the Port's argument that it is not possible to determine the precise amount due to G&T based on its REA. G&T subcontracted electrical work on the C60 project to Elcon, and when G&T submitted its REA to the Port, it indicated that approximately $1.67 million of the $16.6 million it requested was due to amounts G&T owed Elcon. (Dkt. #14, Decl. of Wright, ¶ 13). The Port then alleges that G&T amended the Elcon claim on June 4, 2007, to approximately $2.2 million. (*Id.* at ¶ 20). The Port further alleges that on November 26, 2007, G&T withdrew the Elcon claim, and asserted that "G&T is revising its claim to remove Elcon's claim from G&T's in order to expedite G&T's claim . . . Elcon's claim will be separated from

---

[4] G&T does not attempt to refute these facts in any of its moving papers.

MEMORANDUM ORDER
PAGE - 5

1  G&T's [and] submitted separately as soon as the review is complete." (*Id.*, Ex. 13). As a
2  result, the Port argues that the changing amounts of the Elcon claim have impacted the Port's
3  ability to analyze the various components of the REA. (Dkt. #14 at 15).

4  While G&T and the Port were corresponding in regards to G&T's REA, G&T
5  initiated the instant lawsuit in this Court on September 5, 2007, seeking a declaratory
6  judgment that: (1) the Port immediately (a) notify G&T, in writing, of the specific amount it
7  agrees, in good faith, it owes G&T under the main contract and under the Port issued change
8  orders, and (b) pay G&T within seven (7) calendar days of that written notice, the full amount
9  it admits in good faith it owes G&T, including interest in accordance with Washington law;
10 (2) the Port has waived its right to proceed under the Dispute Resolution Process pursuant to
11 the terms of the contract; and (3) in the alternative, require the parties to comply with the
12 Dispute Resolution Process pursuant to the terms of the contract. (Pl.'s Compl., ¶¶ 4.1-6.2).

13 On November 29, 2007, G&T filed the instant motion for partial summary judgment,
14 seeking to partially enforce the relief requested in its complaint. (Dkt. #7).[5] The Port
15 thereafter filed a cross-motion for summary judgment on December 17, 2007, seeking a
16 declaratory judgment that: (1) the Port is proceeding properly under the contract to evaluate
17 and process the REA submitted by G&T; (2) the Port does not owe G&T anything under the
18 contract or applicable law until that process is complete; (3) the Port has not waived its right
19 to evaluate the REA; and (4) G&T is not allowed to maintain this action or any other lawsuit
20 until the dispute resolution process under the contract is complete. (Dkt. #14 at 1).

21 **B. Standard of Review**

22 Summary judgment is proper where "the pleadings, depositions, answers to
23 interrogatories, and admissions on file, together with the affidavits, if any, show that there is

---

[5] There are two differences between the relief requested in G&T's motion for partial summary judgment and its complaint. First, G&T makes the additional request in its motion that the disputed amounts should be determined at trial. However, G&T does not make such a request in its complaint. Second, G&T does not request in its motion for the Court to compel the parties to proceed with the Dispute Resolution Process pursuant to the contract, whereas G&T makes this request in count three of its complaint.

MEMORANDUM ORDER
PAGE - 6

1  no genuine issue as to any material fact and that the moving party is entitled to judgment as a
2  matter of law." Fed. R. Civ. P. 56©); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247
3  (1986). The Court must draw all reasonable inferences in favor of the non-moving party. *See*
4  *F.D.I.C. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992), *rev'd on other grounds,*
5  512 U.S. 79 (1994). The moving party has the burden of demonstrating the absence of a
6  genuine issue of material fact for trial. *See Anderson*, 477 U.S. at 257. Mere disagreement,
7  or the bald assertion that a genuine issue of material fact exists, no longer precludes the use of
8  summary judgment. *See California Architectural Bldg. Prods., Inc., v. Franciscan Ceramics,*
9  *Inc*., 818 F.2d 1466, 1468 (9th Cir. 1987).

10  Genuine factual issues are those for which the evidence is such that "a reasonable jury
11  could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248. Material facts
12  are those which might affect the outcome of the suit under governing law. *Id.* In ruling on
13  summary judgment, a court does not weigh evidence to determine the truth of the matter, but
14  "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc*., 41 F.3d
15  547, 549 (9th Cir. 1994) (citation omitted). Conclusory or speculative testimony is
16  insufficient to raise a genuine issue of fact to defeat summary judgment. *Anheuser-Busch,*
17  *Inc. v. Natural Beverage Distributors*, 60 F. 3d 337, 345 (9th Cir. 1995). In the context of a
18  contract dispute, interpretation of a contract is a matter of law properly decided on summary
19  judgment. *United States v. King Features Entm't, Inc.*, 843 F.2d 394, 398 (9th Cir. 1988).

20  **C. Applicable Law**

21  This case is properly before the Court based on diversity of the parties. Accordingly,
22  the issues presented are governed by Washington State law. *See Klaxon Co. v. Stentor*
23  *Electric Mfg. Co.*, 313 U.S. 487, 496 (1941); *Insurance Co. N. Am. v. Federal Express*
24  *Corp.*, 189 F.3d 914, 919 (9th Cir. 1999) (explaining that in an ordinary diversity case, federal
25  courts apply the substantive law of the forum in which the court is located). Neither party
26  disputes that Washington State law is applicable in this case.

27

28  **D. The Contract Provisions of the C60 Project**

MEMORANDUM ORDER
PAGE - 7

It is well established under Washington contract law that contracts are interpreted according to the objective manifestation of the parties. *Hearst Communications, Inc. v. Seattle Times Co.*, 154 Wash. 2d 493, 503, 115 P.3d 262 (2005) (citing *Max L. Wells Trust v. Grand Cent. Sauna & Hot Tub Co. of Seattle*, 62 Wn.App. 593, 602, 815 P.2d 284 (1991)). "Courts should not, and cannot, rewrite the clear agreement of the parties." *Warner v. Design and Build Homes, Inc.*, 128 Wn.App. 34, 42, 114 P.3d 664 (2005); *see also Childers v. Alexander*, 18 Wn.App. 706, 711, 571 P.2d 591 (1977) (holding that courts may not "foist upon the parties a contract they never made"). Courts simply do not interpret what was intended to be written, but rather what was in fact written. *Hearst*, 154 Wash. 2d at 504.

Further, while Washington courts have held that a trial court may examine extrinsic evidence "for the purpose of aiding in the interpretation of what is in an instrument," *see Berg v. Hudesman*, 115 Wash. 2d 657, 669, 801 P.2d 222 (1990), Washington courts have made it equally clear that admissible extrinsic evidence does not include evidence that varies, contradicts, or modifies the written language of the contract. *Bort v. Parker*, 110 Wn.App. 561, 574, 42 P.3d 980 (2003). Ultimately, and as *Hearst* makes clear, Washington law continues to follow the objective manifestation theory of contracts. 154 Wash. 2d at 503 (unequivocally stating this holding to clarify its holding in *Berg* that may have been misunderstood to implicate the admission of parol evidence to all contracts). The subjective intent of the parties is therefore irrelevant if the intent can be determined from the actual words used in a contract. *City of Everett v. Estate of Sumstad*, 95 Wn.App 853, 855, 631 P.2d 366 (1981). Moreover, words in a contract are to be given their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates contrary intent. *Hearst*, 154 Wash. 2d at 504 (citing *Universal/Land Constr. Co. v. City of Spokane*, 49 Wn. App. 634, 637, 745 P.2d 53 (1987)).

**1.   G&T's argument that the Port must pay within 30 days**

In this case, G&T argues that when viewing the contract as a whole, the Port is compelled to pay G&T amounts set forth in G&T's REA within 30 days. To support its argument, G&T points primarily to article G-08, titled "Payments, Completion and Final


Acceptance" (Dkt. #14, Ex. 1 at 34), and specifically references articles G-08.01, G-08.02, G-08.04, G-08.06, and G-08.07. (Dkt. #7 at 7); (Dkt. #17 at 2).

As an initial matter, the Court notes that it is undisputed by either party that article G-01.02, titled "Definitions," expressly sets forth the operative definition of a "Claim." (*Id.*). The article provides:

> A claim is a demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract. The term "Claim" *includes Requests for Equitable Adjustment* (until executed by agreed Change Order), disputes, and other matters in questions between the Port and [G&T] arising out of or relating to the Contract. Claims must be initiated by written notice. The responsibility to substantiate Claims shall rest with the party making the Claim.

(*Id.* at 8) (emphasis added).

Furthermore, and for the sake of brevity, the Court finds it unnecessary to reiterate each portion of the C60 project contract that G&T references. But the Court does find that article G-08.04 A and B are relevant to this portion of the analysis. G-08.04 A and B, titled "Progress Payments" provide in pertinent part:

> Progress payments will be made following the Contractor's request therefore once each month during the Contract Time; payment shall be based upon invoices *approved by the Engineer*. All requests for progress payments must be accompanied by documentation required herein. The progress payment will not become due or be processed without required documentation. *Progress payments will be made within thirty (30) days of becoming due* . . . Payment shall be based upon the actual quantities of Work performed *as verified and agreed by the Engineer* according to the Contract documents.

(*Id.* at 34) (emphasis added).

Based on G-08.04 A, it is clear that G&T ignores the plain language of that article which provides that "payment shall be based upon invoices approved by the Engineer." (Dkt. #14, Ex. 1 at 34). Furthermore, a payment becomes due within thirty days only after "verified and agreed by the Engineer." (*Id.*). Thus, only an *approved* payment triggers G&T's right to payment within thirty days. It is unequivocally clear that the REA was never approved by the Port in this case.

In any event, the Court notes that the term "Claim" is noticeably absent from the language of article G-08.04. As the Port indicates, G-08.04 applies to "Progress Payments,"

MEMORANDUM ORDER
PAGE - 9

1  and not "Claims." And as established above, neither party disputes that the REA is a "Claim."
2  Therefore G&T's argument with respect to article G-08 is clearly erroneous. Consequently,
3  the Court is not justified in entering a declaratory judgment in G&T's favor requiring the Port
4  to pay amounts not in dispute within thirty days.

**2. The Port's argument that the provisions of G-09.05 control**

The Port argues that G&T's REA is being reviewed in accordance with the terms of the contract given the language of article G-09.05, titled "Changed Conditions and Claims Including Requests for Equitable Adjustment." (Dkt. #14, Ex. 1 at 44). Moreover, the Port argues that the provisions of G-09.06, titled "Procedures for Protest by the Contractor," are not triggered until it reviews and analyzes G&T's REA. Article G-09.05 A provides in pertinent part:

> The Contractor shall notify the Engineer promptly orally and in writing in accordance with [the notice requirements of] G-04.31 of . . . alleged Contract conditions for which an adjustment in Contract Sum or Contract Time is desired.

(Dkt. #14, Ex. 1 at 44-45)

G-09.05 B goes on to provide in pertinent part:

> If the Engineer determines that the alleged conditions do exist and cause a material change either in the Contractor's costs . . . the Engineer will make an equitable adjustment in the Contract Sum to account for the performance of the work involved . . . If the Port and the Contractor agree on such adjustment, the same shall be set forth in a Change Order to be executed by the parties.

(*Id.* at 45) (emphasis added).

Article G-09.05 concludes with subsection C, which provides:

> If the Engineer determines that the Contractor's request does not warrant an equitable adjustment in the Contract Sum and/or Contract Time, the Contractor shall diligently pursue the Work in accordance with the Engineer's direction *while retaining the right to protest the Engineer's decision in accordance with paragraph G-09.06.*

(*Id.*) (emphasis added).

Based on these provisions, the Port argues that G&T must await the Port's evaluation of G&T's REA before proceeding with the procedures set forth in G-09.06 for challenging a decision made by the Port. However, this argument would lead to an absurd result wherein the Port could simply deny any claim made by a contractor, and stand behind that denial

MEMORANDUM ORDER
PAGE - 10

without allowing a contractor a method to challenge its decision. Further, the language of article G-09.05 C does not support the Port's position. It clearly states that G&T "retains the right to protest the Engineer's decision in accordance with paragraph G-09.06." (*Id.*). Here, it is undisputed that G&T provided its REA in accordance with G-09.05 A on May 10, 2007. It is further undisputed that the Port has not accepted this amount as evidenced by the minutes reflected in the three subsequent meetings following G&T's REA submission, as well as the continued correspondence it has engaged in with G&T questioning the accuracy of the REA. As a result, the Port has effectively denied G&T's REA, and G&T has no choice but to proceed under its clearly defined right to do so under article G-09.06.

The Port's argument that G-09.06 does not yet apply given the facts of this case is further undermined by reviewing the plain language of article G-09.06 B. That section provides in pertinent part:

> If the Contractor disagrees with . . . *the Engineer's denial of a Request for Equitable Adjustment sought by the Contractor*, the Contractor shall give immediate oral notice of protest to the Engineer prior to performing the Work and shall submit a written protest to the Engineer within seven (7) calendar days of the Contractor's receipt of the Change Order. *The protest shall identify the point(s) of disagreement, those portions of the Contract believed to be applicable and an estimate of quantities, costs, and any time extension involved in the change*.

(*Id.*) (emphasis added).

This article clearly sets forth the preliminary procedure for which G&T is supposed to follow if the Port denies its REA. Thus, the Port's argument that G&T must simply wait for the Port to review G&T's REA before the G&T can exercise any right under the contract is nonsensical. As mentioned above, courts simply do not interpret what was intended to be written, but rather what was in fact written. *Hearst*, 154 Wash. 2d at 504. What was written and firmly embedded within this portion of the contract is a clear right for G&T to challenge the Port's decision not to accept G&T's REA. As a result, the Port's argument that the provisions of G-09.06 do not apply in the instant case is unfounded.

**3.     The provisions of article G-09.06 F - "The Dispute Resolution**

MEMORANDUM ORDER
PAGE - 11

**Process"**

The controlling article in regards to the Dispute Resolution Process is found in article G-09.06 E. The article provides in pertinent part:

> 1. Level I. *Within seven (7) days of receipt of the Contractor's documentation* [of article G-09.06 D], the senior site representative of the Contractor and the Resident Engineer of the Port shall meet, confer, and set a schedule for resolving the claim. Such schedule shall complete no later than 14 calendar days after the initial meeting.

(Dkt. #14, Ex. 1 at 46).

The article goes on to state very detailed procedures for Level II and Level III meetings. (*Id*. at 46-47). G&T argues that it attempted to begin the Dispute Resolution Process to no avail. For example, in correspondence to the Port on May 18, 2007, Mr. Berndt stated that G&T believed its REA "to be a 'Claim' that must go through the Dispute Resolution process under G-01.02 and G-09.06 F of the Contract." (Dkt. #8, Decl. of Berndt, Ex. 6). Mr. Berndt goes on to state, "[t]hat is why we saw our [May 16, 2007 meeting] as the first 'Level I' meeting, and hope we can resolve this 'Claim' by working together through the Dispute Resolution Process sections." (*Id.*). When the Port refused to engage in the process, G&T continued to make clear that it believed it was proceeding appropriately under the contract. A letter sent by Mr. Berndt to the Port on May 31, 2007 provides in pertinent part:

> Although [G&T] appreciates the efforts of the Port in speaking with us and since neither party, due to differences of opinion, were able to complete all elements in the schedule for resolving G&T's claim by today, *14 calendar days after our initial 16 May 2007 Level I meeting*, in accordance with paragraph G-09.06 F1, Level I of the Dispute Resolution Process is closed. By this letter, [G&T] requests a Level II meeting be set . . . as required by paragraph G-09.06 F2."

(*Id.*, Ex. 7).

G&T made further attempts to schedule a Level III meeting. (*Id.*, Ex. 9). G&T even took the step to nominate Judge Robert Alsdorf ("Judge Alsdorf") to the Dispute Review Board on June 8, 2007. (*Id.*, Ex. 11). Notably, the Port seemingly acknowledged that the Dispute Resolution Process was underway by asking for the resume of Judge Alsdorf and indicating to G&T that "[w]e're working on offering a candidate or candidates for you to look

MEMORANDUM ORDER
PAGE - 12

1  at also." (*Id.*, Ex. 12).

2  However, waiving a right to participate in the dispute resolution process "requires *unequivocal* acts of conduct evidencing an intent to waive." *Mike M. Johnson, Inc. v. Spokane County*, 150 Wash. 2d 375, 391, 78 P.3d 161 (2003) (emphasis added). Equivocal conduct by definition cannot be unequivocal. *American Safety Casualty Ins. Co. v. City of Olympia*, 174 P.3d 54, 59 (2007). As clearly laid out above, G&T alone held the belief that it was participating in the Dispute Resolution Process, and that the Levels I-III meetings were not taking place in accordance with the contract. But there is no evidence that the Port agreed that such meetings were taking place. In fact, the evidence indicates that the Port, through Mr. Mequet, made clear to G&T that the Dispute Resolution Process was not underway. Mr. Mequet's declaration provides:

> I advised [Mr.] Berndt . . . that the Port would treat this REA just the same as any other REA that G&T had submitted on this and other projects at Sea-Tac. By that I meant that the Port would follow the process it has always followed with contractors for as long as I have been in charge of the major capital construction projects at Sea-Tac: review and evaluate the REA to determine if it had merit; ask questions and seek additional documents to clarify and understand the basis for the REA; work with the contractor to resolve areas of disagreement; and try to reach an agreement on the amount, if any, to be paid . . . It was premature to follow [the Dispute Resolution] process until the Port had finished its evaluation.

(Dkt. #14, Decl. of Mequet, ¶ 6).

Additionally, evidence submitted by G&T themselves indicate that the Port did not believe the procedures set forth in G-09.06 F were beginning. Notes from a meeting drafted by G&T provide, "[t]he Port states this is an REA and not in the dispute resolution process at Level One." (Dkt. #8, Decl. of Berndt, Ex. 4).

The Port also points to the provisions of G-09.06 F6 to support its argument that it has not waived any rights under the contract. That section provides:

> If the claim is not resolved in the Level III meeting and no Dispute Review Board is required, the Contractor may bring no claim against the Port in litigation unless the claim is first subject to non-binding mediation or non-binding arbitration as mutually agreed by the Port and Contractor.

(Dkt. #14, Ex. 1 at 47).

As a result, there is no evidence submitted by G&T that indicates that the Port waived

MEMORANDUM ORDER
PAGE - 13

their right to participate in mediation or arbitration. Therefore the Port ultimately did not waive their right to participate in the Dispute Resolution Process set forth in G-09.06 F. At best, there is an email from the Port indicating that they were contemplating a nominee to the Dispute Resolution Board. But a party that simply enters into negotiation does not necessarily waive its contractual rights. *American Safety*, 174 P.3d at 59. Under such circumstances, the Court cannot find that the Port *unequivocally* waived its rights under the contract for the C60 project.

Furthermore, Washington contract law strongly favors the public policy of settlement over litigation. *American Safety*, 174 P.3d at 59; *City of Seattle v. Blume*, 134 Wash. 2d 243, 258, 947 P.2d 223 (1997) ("[T]he express policy of this state . . . strongly encourages settlement"); *Haller v. Wallis*, 89 Wash. 2d 539, 545, 573 P.2d 1302 (1978) ("[T]he law favors amicable settlement of disputes"). Therefore the Court finds that the appropriate remedy in the instant case is to enter a declaratory judgment compelling the parties to proceed with the Dispute Resolution Process as set forth in article G-09.06 F. This remedy is further buttressed by the fact that both parties agree to a certain extent on this result. For example, the Port states in its reply that "should the court side with G&T and decide that [article] G-09.05 is somehow not applicable to G&T's REA, the correct declaratory ruling is that all steps of the dispute resolution process under [article] G-09.06 should be followed with a further ruling as to whether that process includes a Dispute Review Board." (Dkt. #21 at 10-11). In addition, G&T states in Count 3 of its complaint that the Court should "[i]n the alternative . . . [require] the Port to comply with the 'Dispute Resolution Process' provisions of the contract." (Dkt. #1, Pl.'s Compl. ¶¶ 6.1, 6.2). Moreover, because the Court has rejected both (1) G&T's argument that the Port is required to pay G&T within 30 days, and (2) the Port's argument that it is properly proceeding under article G-09.05, compelling the parties to proceed with the Dispute Resolution Process under article G-09.06 F is indeed the most appropriate remedy.

### 4.     The parties have waived their right to appoint a nominee to the Dispute Resolution Board

MEMORANDUM ORDER
PAGE - 14

1   The Port seeks a ruling from the Court to determine whether the parties have waived
2   their right to nominate a candidate to the DRB as set forth in article G-09.06. (Dkt. #21 at
3   10-11). SC-09.06 b, titled "Composition of the DRB" clearly controls. That section provides
4   that "[t]he DRB shall consist of one member elected by the Port and one member elected by
5   the Contractor. *Each of these members shall be elected within 60 days of the Award*." (Dkt.
6   #14, Ex. 1 at 72) (emphasis added). Further, "award" is defined by G-01.02 as the
7   "[e]ffective date the Agreement Form is executed by the Port of Seattle, and the start of the
8   Contract Time." (*Id.* at 8).

9   Here, the Port indicates that the parties entered into the contract on May 14, 2004.
10  (Dkt. #14 at 2). And while G&T never states the precise date the contract began, it indicates
11  in its complaint that its bid was accepted in 2004. (Dkt. #1, Pl.'s Compl. ¶ 3.3). Thus, based
12  on the plain language of the contract, for a party to exercise its right to nominate a member to
13  the DRB, it must have done so within 60 days of May 14, 2004. However, the record before
14  the Court is abundantly clear that G&T did not nominate a member to the DRB until June 8,
15  2007. (Dkt. #8, Ex. 11). There is also no evidence that the Port nominated anyone to the
16  DRB. The Court therefore finds that both parties have waived their right to nominate a
17  member to the DRB.

### E.    RCW 39.04.250(2)

19  Because the Court finds that the appropriate remedy is to compel the parties to
20  proceed with the procedures set forth in article G-09.06 F, the Court finds it unnecessary to
21  address the parties' respective arguments with respect to RCW 39.04.250(2).

### III.  CONCLUSION

23  Having reviewed the relevant pleadings, the declarations and exhibits attached thereto,
24  and the remainder of the record, the Court hereby finds and orders:
25  (1) "Plaintiff G&T Conveyor Company, Inc.'s Motion for Partial Summary
26  Judgment" (Dkt. #7) is DENIED.
27  (2) "Port of Seattle's Cross Motion for Summary Judgment" (Dkt. #14) is
28  GRANTED IN PART. The Court finds that Plaintiff is not allowed to maintain this action

MEMORANDUM ORDER
PAGE - 15

until the Dispute Resolution Process under the contract between the respective parties is complete.

(3) The parties are DIRECTED to commence with the Dispute Resolution Process pursuant to article G-09.06 F of the contract <u>no later than fourteen (14) days from the date of the Order</u>. Specifically, the parties shall conduct a Level I meeting pursuant to G-09.06 F1 and subsequently follow the remaining procedures set forth in G-09.06. However, the Court finds that both parties have waived their right to nominate a member to the Dispute Resolution Board, thereby rendering G-09.06 F5 null and void.

(4) Rather than dismissing the action, the Court finds it appropriate to STAY the instant litigation. The parties shall submit a Joint Status Report within six (6) months updating the Court on the status of their negotiations, at which time the Court shall dismiss the action if appropriate.

(5) The Clerk is directed to forward a copy of this Order to all counsel of record.

DATED this 7th day of March, 2008.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MEMORANDUM ORDER
PAGE - 17